TAGGED OPINION

**ORDERED in the Southern District of Florida on January 13, 2010.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

MAISON GRANDE CONDOMINIUM                    Case No. 09-21589-LMI
ASSOCIATION, INC., a Florida
not-for-profit corporation,                              Chapter 11

                Debtor.
_____/

### <u>ORDER GRANTING DEBTOR'S MOTION TO REJECT UNEXPIRED LEASE</u>

This cause came before me at an evidentiary hearing conducted on September 9, September 16, and October 2, 2009, regarding the relief sought by the Debtor, Maison Grande Condominium Association, Inc. in the *Debtor's Emergency Motion to Reject Unexpired Lease* (D.E. #8) (the "Rejection Motion"). I have considered the Rejection Motion, the Response (D.E. #84) and Supplement to Response (D.E. #118) to the Rejection Motion filed by Dorten, Inc. and Robert L. Siegel, the Debtor's Reply Briefs (D.E. #120 and #121), the testimony of the

witnesses, the admitted evidence, and the argument of counsel.  Based on all of the foregoing, and for the reasons set forth below, I grant the Rejection Motion.[1]

## FINDINGS OF FACT

The Debtor, Maison Grande Condominium Association, Inc. (the "Debtor" or the "Association"), was formed by the filing of Articles of Incorporation (the "Articles") with the Florida Secretary of State on March 23, 1971.  [Exhibit "F" to Lessor's Trial Exhibit #1]. Maison Grande, Inc. (the "Developer") formed the Association to serve as the condominium association for the Maison Grande Condominium (the "Maison Grande" or "Condominium").

The Maison Grande Condominium was created by the filing of the November 24, 1971, Declaration of Condominium ("Declaration") of Maison Grande Condominium by the Developer in Official Records Book 7485, at Pages 835-912, of the Public Records of Miami-Dade County, Florida.  [Lessor's Ex. 1].

The Maison Grande Condominium is a residential condominium[2] located at 6039 Collins Avenue in Miami Beach, Florida.  The Maison Grande is situated on oceanfront property. [T. 341, ln. 8-9].[3]  It is comprised of 502 privately owned units and common areas.  The Maison Grande is managed by the Association, a Florida not-for-profit corporation.  The unit owners fund the Association primarily through maintenance assessments, which accrue monthly. Additionally, from time to time, the Association raises money by making special assessments. (D.E. #8, ¶6).[4]

---

[1] The following constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52 made applicable to this contested matter pursuant to Fed. R. Bankr. P. 7052 and Fed. R. Bankr. P. 9014.

[2] A condominium is a form of ownership of real property comprised entirely of units and common elements.  Fla. Stat. §718.103(11).  The units are the portions subject to exclusive ownership.  Fla. Stat. § 718.103(27).  The common elements are the portions of the real property not included in the units.  Fla. Stat. § 718.103(8).

[3] References to the transcript of the evidentiary hearing are denoted as "T.__."

[4] A condominium association is authorized by statute to make and collect assessments.  Fla. Stat. § 718.111(4).  An assessment is "a share of the funds which are required for the payment of common expenses, which from time to

While the Developer was in control of the Association, it caused the Association to execute a document entitled "Ninety-Nine Year Lease" (the "Lease").  The other parties to the Lease were the Siegel Family Trust (the "Trust") and Dorten, Inc. ("Dorten").  The Trust and Dorten (collectively referred to as the "Lessor") were affiliates of the Developer when the Lease was executed.  One individual, Robert L. Turchin, signed the Lease for both sides of the transaction, as president of both Dorten and the Association.   Pursuant to the Lease, the Lessor leased to the Association a sliver of real property, approximately 10,000 square feet, on which is located a swimming pool, a small portion of the pool deck, and certain parking garage spaces located underneath the pool.

The Lease is for a term of 99 years commencing on November 24, 1971.  The Lease is currently in year 38 of its 99-year term.  The amount of rent due under the Lease in 1971 was $20,160 per month, or $241,920 a year.  [Lessor's Ex. 2, p.3].  However, the Lease provides that the rental payment due shall increase each year by a formula tied to the "Consumer's Price Index, United States Average - All Items of Food." *Id*. at pp.3-4.[5]  Currently, the rent due under the Lease is $112,241.95 per month, or $1,346,903.40 a year.  (D.E. #8, ¶14).  The Lease also provides that the Association and the unit owners are responsible for payment of taxes, insurance, upkeep and maintenance of the leased premises.  [Lessor's Ex. 2, pp.5, 7, 8].

Starting in 2008, a significant number of unit owners became delinquent on their assessment obligations to the Association.  As a result, the Association lacked the resources to pay all of its expenses.  The Association's financial difficulties continued into 2009.  By early

---

time is assessed against the unit owner."  Fla. Stat. § 718.103(1).  A special assessment is "any assessment levied against a unit owner other than the assessment required by a budget adopted annually." Fla. Stat. § 718.103(24).
[5] The Florida legislature has declared such clauses void as against public policy.  *See* Fla. Stat. § 718.4015.  Because that statute was enacted after the Lease was executed, it has been held not to apply to the Lease. *See Maison Grande Condo. Ass'n v. Dorten, Inc.,* 580 So.2d 859 (Fla. 3d DCA 1991) *aff'd in part, rev'd in part* 600 So.2d 463 (Fla. 1992).

2009, approximately twenty-five percent (25%) of unit owners were delinquent on the payment of their assessment obligations including obligations to pay a special assessment that had been levied the prior year.  Many of those units lacked equity and were the subject of mortgage foreclosure proceedings.

The board of directors of the Association (the "Board") responded to the adverse financial impact of the delinquencies by closely scrutinizing expenses, taking various steps to reduce those expenses, and working with legal counsel to seek to collect assessments from delinquent unit owners.  Notwithstanding such steps, the Association's expenses continued to exceed its revenue.  [T. 71-73].

The Board considered whether it could cover the shortfall by imposing another special assessment against unit owners.  In so doing, the Board solicited the input of unit owners.  Some owners advised members of the Board that they lacked the financial resources to pay additional assessments.  Others advised the Board that they would refuse to pay additional assessments that were only necessitated by other owners not paying their fair share.  [T. 80, ln. 1-25].

The Board also took into consideration the demographics of the unit owners, including the fact that many are elderly and on fixed incomes.  Based on such information, the Board determined that it could not remedy the Association's financial difficulties through increased assessments, because that would only result in increased delinquencies.

The Board examined its budget to see if any further expenses could be reduced or eliminated.  However, by this point the only expenses being paid were electric, water, cleaning service, the car valet (there is no parking for guests) and the pool.[6]  The Board then considered

---

[6] The Lessor makes much of the fact that the Lease constituted approximately one-third of the Association's budget when the Association was formed and still makes up one-third the Association budget.  I find this fact is not relevant in assessing whether the Board properly exercised its business judgment in determining to seek rejection of the Lease at this time under the circumstances proven at trial.

whether it could eliminate the shortfall by eliminating or reducing its single largest expense – rent payments under the Lease. The Board formed a special committee comprised of Board members and other unit owners to study the situation.  Although the Board explained its financial difficulties to the Lessor and attempted to negotiate a purchase of the leased premises, the Lessor ultimately refused to consider a sale.  [T. 61-62, ln. 25-3; T. 88, ln. 9-11].

In or about January 2009, the Association ceased paying the monthly rent due under the Lease.  On or about April 23, 2009, the Lessor filed an action in the Circuit Court of Miami-Dade County, Florida, and thereafter sought the appointment of a receiver to take control of the Association.  (D.E. #84-5). On June 10, 2009, the Association commenced this bankruptcy case by filing a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  At the time the Association filed its petition, a hearing on Lessor's Urgent Motion to Appoint Receiver in the state court action had been scheduled for June 22, 2009.  (D.E. #84-5).

## PROCEDURAL HISTORY

On June 12, 2009, the Association filed the Rejection Motion.  The Debtor submits it did so in an attempt to relieve the Association of its sizeable and growing payment obligation for benefits that were not critical to the operation of the Condominium or the health and safety of unit owners.  The Lessor claims the Association filed bankruptcy solely for the purpose of rejecting the Lease.

The Rejection Motion was filed as an emergency and originally scheduled for hearing on June 18, 2009.  The Lessor filed a Motion to Continue, citing unavailability, and the Lessor and the Association filed an Agreed Order continuing the hearing until June 23, 2009.  (D.E. #24). This date apparently created a conflict for the Debtor and so a second Agreed Order was

submitted and signed, continuing the hearing to July 15, 2009.  (D.E. #27).  The Lessor and the Association agreed to a further continuance based on the parties' decision to mediate.  A final Agreed Order was submitted and signed continuing the hearing on the Rejection Motion to September 9, 2009.  (D.E. #48).  The mediation was unsuccessful and so the evidentiary hearing went forward on September 9, continued on September 16 and concluded on October 2, 2009.[7]

In the Rejection Motion the Debtor argues that rejection of the Lease is appropriate because the monthly rent due under the Lease is oppressive, unrelated to the Lessor's actual cost, and a strain on the Debtor's resources.  The Debtor seeks rejection of the Lease in order "to pay all allowed claims in full over a reasonable plan term and continue healthy operations thereafter."

On August 17, 2009, the Lessor filed its response to the Rejection Motion.  The Lessor's primary argument is that the Association cannot reject the Lease because the Association has failed to exercise its business judgment appropriately – "without trying to be overly dramatic or trite, it is almost unimaginable how one could think of a more egregious example of a complete lack of judgment of any kind."  (D.E. #84, p.2).

The Lessor argues that rejection of the Lease will cause the Condominium to lose its Certificate of Occupancy, that rejection will subject each of the individual unit owners to direct

---

[7] The Debtor argues that by operation of law, the Lease has already been rejected pursuant to 11 U.S.C. §365(d)(4)(A).  The Debtor relies on several cases, all of which appear to hold that, if a debtor files a motion to reject and the court does not rule prior to expiration of the statutory period, the Lease is nonetheless rejected.  *See Arizona Appetito's Stores, Inc. v. Paradise Vill. Inv. Co.,* 893 F.2d 216, 218 (9th Cir. 1990); *National Record Mart, Inc. v. Watercress Assocs. Joint Venture (In re National Record Mart, Inc.),* 272 B.R. 131, 133-35 (Bankr. W.D. Pa. 2002); *WB, Ltd. v. Tobago Bay Trading Co. (In re Tobago Bay Trading Co.),* 142 B.R. 528, 532-33 (Bankr. N.D. Ga. 1991); *In re Country Boy Waterbeds, Inc.,* 104 B.R. 822, 824 (Bankr. W.D. Ky. 1989).  However, section 365(d)(4) also provides that the rejection deadline may be extended "upon prior written consent of the lessor." Because the Lessor consented to, indeed requested, extensions of the hearing on the Rejection Motion, which consent impliedly included an extension through my ruling on the Rejection Motion, I find that the Lease was not deemed rejected pursuant to section 365(d)(4)(A).

payment of all Lease obligations,[8] and to possible foreclosure of alleged liens on their units, and that rejection will give the Lessor the right to foreclose its alleged security interest on all property of the Condominium and the Association.

## CONCLUSIONS OF LAW

### I.    Legal Standard

Section 365 of the Bankruptcy Code affords the right to reject executory contracts and unexpired leases to a trustee in a bankruptcy case, subject only to court approval.  11 U.S.C. § 365.  Because the Association operates as a debtor-in-possession in this Chapter 11 case, it possesses the rights afforded trustees by section 365.  *See* 11 U.S.C. § 1107.

### The Business Judgment Test

Both the Debtor and the Lessor agree that the appropriate standard by which I must measure the Association's proposed rejection of the Lease is whether the Debtor's decision to reject the Lease pursuant to 11 U.S.C. §365 is a sound exercise of the Debtor's "business judgment."  *See Byrd v. Gardinier, Inc. (In re Gardinier, Inc.),* 831 F.2d 974, 976 n.2 (11th Cir. 1987) ("The only limitation on the trustee's discretion  [to assume or reject an executor contract] is that it is subject to court approval.  However, since courts review a trustee's decision to assume or reject a contract under a traditional "business judgment" standard, the scope of review in this area is narrow.") *In re Surfside Resort and Suites*, *Inc.*, 325 B.R. 465, 469 (Bankr. M.D. Fla. 2005)  ("A court may not substitute its judgment for that of a debtor unless the debtor's decision that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on 'bad faith', whim, or caprice.") (internal quotations and citation omitted).

---

[8] Lessor filed a claim for prepetition amounts due in the amount of $599,792.17 (plus interest, attorney fees and costs), alleges it will have a rejection claim of $4.5 million, and has argued that until rejection it is owed administrative rent.  The Court will address these claim issues at a later date.

In *In re Prime Motor Inns*, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991), the court stated "a debtor's rejection of an executory contract is proper if it would be advantageous to the debtor's estate."  *See also In re Dunes Hotel Assocs.*, 194 B.R. 967, 988 (Bankr. D. S.C. 1995) ("Numerous courts in other districts have also held that to utilize § 365, there must be a showing that the rejection will benefit the estate or creditors, but certainly more than merely benefiting the debtor itself or its equity holders.").

As the Fourth Circuit explained as follow in *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985)

> As generally formulated and applied in corporate litigation the rule is that courts should defer to -- should not interfere with – decisions of corporate directors upon matters entrusted to their business judgment except upon a finding of bad faith or gross abuse of their "business discretion."  Transposed to the bankruptcy context, the rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith, or in gross abuse of the bankrupt's retained business discretion . . .
>
> The issue . . . is whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice.  That issue is one of fact to be decided as such by the bankruptcy court by the normal processes of fact adjudication."

*Id.* at 1047 (internal citations omitted).

Because the business judgment rule is to be liberally applied, motions to reject leases should ordinarily be granted.  *See Gardinier*, 831 F.2d at 976 n.2; *In re Old Carco LLC*, 406 B.R. 180, 193 (Bankr. S.D.N.Y. 2009) ("[W]hether the debtor is making the best or even a good business decision is not a material issue of fact under the business judgment test.") (internal citation omitted); *In re Prime Motor Inns*, 124 B.R. at 381; *In re Condo. Ass'n of Plaza Towers South, Inc.,* 43 B.R. 18, 22 (Bankr. S.D. Fla. 1984) (approving condominium association's rejection of 99-year recreation lease under business judgment rule and explaining that "the Court

will not second guess the business judgment of Plaza Towers' Board of Directors unless there is a showing that their judgment is clearly erroneous."); *In re Stable Mews Assocs.,* 41 B.R. 594, 600-01 (Bankr. S.D.N.Y. 1984) ("The business judgment test leaves no room for speculation as to which business choice will yield the greater return, once it has been shown that the Trustee's choice will benefit the estate and unsecured creditors.").

The Lessor argues that, because the Debtor is a Florida condominium association, the exercise of the Association's business judgment must also be measured against its fiduciary obligations to the unit owners. I agree that it is appropriate to look at Florida law to determine what are the Association's obligations to the unit owners, and how those obligations are measured.

Florida law requires that every condominium must be operated by an association which association must be either a for-profit or not-for-profit corporation. Fla. Stat §718.111(1)(a). The Florida statute specifically directs that – "The officers and directors of the association have a fiduciary relationship to the unit owners." *Id.* Moreover "[a]s required by s. 617.0830, an officer, director, or agent shall discharge his or her duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner he or she reasonably believes to be in the interests of the association." Fla. Stat. §718.111(1)(d).

Fla. Stat. §617.0830 sets forth the standards for performance by directors of their corporate obligations:

> (1)    A director shall discharge his or her duties as a director, including his or her duties as member of a committee:
> (a)    In good faith;
> (b)    With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
> (c)    In a manner he or she reasonably believes to be in the best interests of the

corporation.

(2)    In discharging his or her duties, a director may rely on information, opinions, reports, or statements, including financial statements and other financial data, if prepared or presented by:

(a)    One or more officers or employees of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

(b)    Legal counsel, public accountants, or other persons as to matters the director reasonably believes are within the persons' professional or expert competence; or

(c)    A committee of the board of directors of which he or she is not a member if the director reasonably believes the committee merits confidence.

(3)    A director is not acting in good faith if he or she has knowledge concerning the matter in question that makes reliance otherwise permitted by subsection (2) unwarranted.

(4)    A director is not liable for any action taken as a director, or any failure to take any action, if he or she performed the duties of his or her office in compliance with this section.

Actions of Florida condominium association boards are subject to the business judgment rule. *Garcia v. Crescent Plaza Condo. Ass'n.*, 813 So.2d 975 (Fla. 2d DCA 2002); *Cedar Cove Efficiency Condo Ass'n v. Cedar Cove Props., Inc.*, 558 So.2d 475 (Fla. 1st DCA 1990); *Farrington v. Casa Solana Condo. Ass'n,* 517 So.2d 70 (Fla. 3d DCA 1987). However, the business judgment rule will only insulate an association's board if the board acts in a reasonable manner. *Id.* The determination of whether a board acted in a reasonable manner is a fact intensive determination, *Sarasota Tile & Terrazzo Corp. v. DeSoto Terrazzo Corp.*, 105 So.2d 811 (Fla. 2d DCA 1958) (question of fact precluded summary judgment on whether board acted unreasonably in voting for salary increase), and is measured by reviewing both the procedures used in making a decision, i.e., did the board follow the procedures of the Condominium Act, the Declaration, and its own by-laws, and consideration of the bases upon which the board made its decision. *See Farrington*, 517 So.2d 70. Whether a condominium association board has breached its fiduciary duty is also measured by the business judgment rule. *See Sonny Boy, L.L.C. v. Asnani,* 879 So.2d 25 (Fla. 5th DCA 2004).

"The declaration of condominium, which is the condominium's 'constitution,' creates the condominium and strictly governs the relationships among the condominium units owners and the condominium association."  *In re Bayshore Yacht & Tennis Club Condo. Ass'n.*, 336 B.R. 866, 874 (Bankr. S.D. Fla. 2006) (internal citations and punctuation omitted).  As such, the Debtor derives its powers, duties and responsibilities from the Declaration and the relevant condominium statutes, Fla. Stat. § 718.  *See Raines v. Palm Beach Leisureville Cmty. Ass'n,* 413 So.2d 30, 32 (Fla. 1982).  The Debtor's Articles of Incorporation specifically state that, "The powers of the Association shall be subject to and shall be exercised in accordance with the provisions of the Declaration of Condominium and the By-Laws[]" [Articles, § 3.4], and Ms. Martin, Treasurer of the Association, acknowledged that the Board of Directors governs the Maison Grande pursuant to the Declaration.  [T. 112, ln. 25 - T. 113, ln.3].

Thus, in determining whether the Association has met its threshold burden on rejection, I must determine whether the Association acted reasonably and consistent with the Declaration, the Condominium By-Laws[9] and the Condominium Act.

## THE ASSOCIATION ACTED REASONABLY IN DECIDING TO REJECT THE LEASE

Having reviewed the evidence, I find that the Association has adequately demonstrated that its decision to reject the Lease was a proper exercise of its business judgment as to how best to restructure the Association's finances, and was consistent with the Board's fiduciary duties to its members.  Both the procedures followed by the Association and the process of decision-making were reasonable and consistent with the Board's duties and obligations under the condominium documents and applicable law.

The Lessor has argued that the Board did not give adequate notice of the meeting at

---

[9] The Declaration, the Association's Articles of Incorporation and By-laws will be referred to collectively as (the "condominium documents").

which it was determined that the Association should file bankruptcy. The Lessor is wrong. Neither the Condominium Act nor the condominium documents require that unit owners vote on a decision to place the Association in bankruptcy. Therefore, in the absence of a prohibition to file bankruptcy, the decision to file is and was a Board decision. Article 3.6 of the By-laws requires that a special meeting of the directors shall be called upon no less than three days notice.[10] While the evidence is not clear when the directors received notice of the meeting, even if directors did not have three full days notice, the By-laws do provide that "[a]ny director may waive notice of a meeting before or after the meeting and such waiver shall be deemed equivalent to the giving of notice." [By-laws, article 3.7] Ms. Martin testified that the members of Board at the meeting voted unanimously to file bankruptcy, [T. 149, ln. 10-11] and the appropriate quorum was present. [Lessor Ex. 5] It is well-settled that attendance at, and participation in, a board or shareholder meeting, constitutes waiver of any alleged improper notice.

Moreover, although unit owners did not vote on the decision to file bankruptcy, their opinions were solicited and many owners were present at the meeting at which the Board voted to file the bankruptcy petition.[11] Thus, while even Ms. Martin agreed that even "more" notice would have been "better," I find the meeting was duly called, duly noticed, and that the unanimous vote of the Board was consistent with the provisions of the condominium documents and the applicable law.

The more significant issue is whether the Association had a reasonable basis to seek

---

[10] Ms. Martin testified that an emergency meeting can be held on 24 hours notice but I found no support for this in the By-laws (T. 99).

[11] According to the testimony of Ms. Martin, the Board has kept unit owners apprised of the progress of the bankruptcy case, including the nature and extent of the Lessor's opposition to the case generally and the Rejection Motion in particular. A substantial number of unit owners attended all three days of the evidentiary hearing and none of those unit owners appeared in opposition to the Debtor's motion to reject. Moreover, although the case has been pending since June 10, 2009 and the Rejection Motion was initially filed on June 12, 2009, no unit owner has filed an objection to the motion.

rejection of the Lease.  The Lessor says the Association has acted unreasonably and in breach of its fiduciary duty to the unit owners.  I find, based on the evidence, including the testimony of Ms. Martin and Mr. Lorber, both of whom I find credible in all respects, the Association did act reasonably seeking to reject the Lease and did not breach its fiduciary duty to unit owners in seeking such relief.

Ms. Martin, who, in addition to being the Association's Treasurer is also an accountant and the chief financial officer of a major real estate developer, testified regarding the Board's reasoning in seeking to reject the Lease. Ms. Martin testified that the Association sought to reject the Lease because the Board determined that it could no longer afford the substantial rent obligation and pay the Association's other obligations.  Ms. Martin testified that in 2008 the Board was behind on its obligations for insurance, security and utilities in order to pay the rent due under the Lease.  Ms. Martin also testified that the Board determined it could not and would not seek to assess its unit owners in an amount required to make up the shortfall on expenses caused by the combination of the increased Lease payments and the failure of certain unit owners to pay.  Ms. Martin testified that the Board determined, after consulting with its unit owners and with its lawyers, including its collection attorneys, that filing bankruptcy and seeking to reject the Lease was the only alternative available to survive financially.[12]  [T. 105, ln. 16-21; T. 149, ln. 5-11]

Ms. Martin also testified that, in determining whether to file bankruptcy and whether to reject the Lease, the Association considered each of the various arguments that the Lessor raised in opposition to the Rejection Motion.  These included the Lessor's argument that rejection

---

[12] Because the Board determined that the Association could not afford to continue making Lease payments, it taped off the leased premises.  The decision of the Board to impede access to the swimming pool (in the heat of the South Florida summer) and the parking spaces was fully supported by unit owners.

would cause the Condominium to lose its certificate of occupancy, and that the Lessor could and would respond to rejection by foreclosing its alleged liens on property of the Association and unit owners in order to collect future rent.  The Board also considered the impact of rejection damages on the Association's ability to reorganize as well as the impact of rejection on unit owners. [T. 103-104, ln. 25-16] Ms. Martin testified that the Association could not pay all its bills, that the Association has been unable to pay for necessary repairs (e.g. carpets, gym) or upgrades, because there is no money, and that the Association reasonably believed, based on the demographics of its owners and communications with owners, that many cannot or will not pay more than they are paying because others can't or won't pay.  Ms. Martin testified that the Association analyzed each of the Lessor's arguments with the input of legal counsel and unit owners.  She testified that, after deliberate consideration, the Association determined that the interests of the unit owners are best served by rejection of the Lease.[13] [T. 105, ln. 16-21].

The Board has a fiduciary obligation to its members.  As described by the Lessor's expert "[a] condominium association exists to serve basically the health and safety and preserve the property for the unit owners.  It's a conduit through which the unit owners can operate to maintain the value and standards of their property." [T. 346, ln. 4-8].  As noted previously, Florida law recognizes that the director of a corporation may, "in discharging his or her duties" rely on information provided by legal counsel "or other persons as to matters the director reasonably believes to be reliable and competent in the matters presented." Fla. Stat. §617.0830.

Accordingly, I find that the Association has satisfied its burden that seeking rejection of the Lease is an appropriate exercise of its business judgment and consistent with the Board's fiduciary obligations to the unit owners.

---

[13] Indeed, the Lessor's expert conceded that a) if the effect of rejection was that each owner could only be liable for his or her pro rata share or b) if they had already reduced line items in the budget, then the choice made by the Board would not necessarily have been inappropriate.  [T. 390, ln. 9-18]

As I cannot substitute my judgment for that of the Debtor, I may only deny the Rejection Motion if I find that the Debtor's decision that "rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, whim or caprice." *Lubrizol*, 756 F.2d at 1047; *In re Surfside Resort and Suites, Inc.*, 325 B.R. 465; *In re Prime Motor Inns*, 124 B.R. 378.  This, the Lessor, contends, is the case, and the reason why the Rejection Motion should be denied.

The party opposing rejection must demonstrate that the decision "derives from bad faith, whim or caprice" and, therefore is not entitled to judicial deference.  *See In re Central Jersey Airport Servs., LLC,* 282 B.R. 176, 183 (Bankr. D. N.J. 2002); *In re Wheeling-Pittsburgh Steel Corp.,* 72 B.R. 845, 849 (Bankr. W.D. Pa. 1987).  The Lessor has raised a myriad of issues, all of which, the Lessor claims, demonstrate the Association has acted in bad faith, whim, or caprice and contrary to the best interest of the unit owners.  I shall address each issue raised by Lessor,[14] as in each instance I find that the Lessor has failed to demonstrate the Association has acted in bad faith, or by whim or caprice.

### Loss of the Certificate of Occupancy is Unlikely

The Lessor argues that if the Lease is rejected, the Condominium will lose its certificate of occupancy because the Debtor will not have the number of parking spaces that it is required to have by the City of Miami Beach.  [D.E. #84, p. 25].[15]

---

[14] I need not make a conclusive determination on certain issues in the context of the Rejection Motion which involve parties not before me now – the unit owners.  Indeed, it might be improper to do so in light of the summary nature of proceedings under 11 U.S.C. § 365.  *See In re Orion Pictures Corp.,* 4 F.3d 1095 (reversing bankruptcy court attempt to conclusively resolve contract-related disputes in context of motion under 11 U.S.C. § 365).

[15] Lessor claimed that in the case *Levinson v. Maison Grande, Inc.*, 517 F. Supp. 963, 969 (S.D. Fla. 1981) the District Court held that the parking spaces "are necessary to qualify the Maison Grande for a certificate of occupancy from the city [SIC] of  Miami Beach" and that such holding was *res judicata*, or at least, *collateral estoppel*, as to this issue.  As I stated in open court, the issue in the *Levinson* case was whether the Lease violated anti-trust laws.  The District Court statement regarding the parking spaces doesn't even qualify as dicta.  Moreover, the applicable City of Miami Beach zoning ordinance has been amended since *Levinson* was decided and therefore the *Levinson* case has no bearing whatsoever on this issue.

The Association presented the testimony of Richard Lorber.  Mr. Lorber is the Planning and Zoning Manager of the City's Planning Department.  [T. 8, ln. 16–24].  He is charged by the City with administering and interpreting the City's Code of Ordinances as it relates to real property and related improvements located within the City [T. 8, ln. 25 – T. 9, ln. 18].  Mr. Lorber's interpretations are binding on the City unless and until reversed on appeal to the City's Board of Adjustment.  [T. 9, ln. 6 – T. 10, ln. 3; T. 49, ln. 11 – T. 50, ln. 17].

The ordinance at issue, Ordinance No. 98-3108 [Debtor's Ex. 6], requires that most buildings have certain parking available.  Moreover, Section 7-2 D. of the ordinance provides that "no existing required parking space may be eliminated for any [u]se."  The Lessor argues that, upon rejection of the Lease, the 46 parking spaces subject of the Lease will be eliminated in violation of the ordinance, and therefore the Condominium will lose its certificate of occupancy. Mr. Lorber testified that certificates of occupancy are not revoked lightly. [T. 31, ln. 16]. Mr. Lorber testified that the parking ordinance will not be implicated unless and until required parking spaces are permanently destroyed.  [T. 15, ln. 15–19; T. 32, ln. 11–18; T. 33, ln. 21–24]. There is no evidence in the record to suggest that the Association has any plans to physically destroy required parking spaces in connection with the rejection of the Lease.   Moreover, Mr. Lorber testified that the Lessor does not have the legal right to destroy any required spaces[16] unless and until the City approves alternate parking arrangements for the Condominium.[17] [Debtor's Ex. 5, pp. 2–3].

---

[16] The Lessor has stated that if the Lease is rejected, it will seek to collect post-rejection rent directly from unit owners.  As acknowledged by the Lessor's expert witness, the Lessor cannot destroy the spaces or otherwise make the spaces unavailable if it intends to collect rent for their continued use.  [T. 408, ln. 14–18].  The Lessor's election to continue seeking rent from unit owners  may also impact Lessor's rejection claim but I will address that issue at such time, as any, that a rejection claim is filed.

[17] Mr. Lorber testified that the City did not condition the effectiveness of the Condominium's certificate of occupancy upon the effectiveness of the Lease.  [T. 16, ln. 15–25].  Indeed, the City approved the Condominium's parking plan two years before the Lease was signed, [T. 16, ln. 6–14; T. 51, ln. 12-22]; Mr. Lorber testified that the Developer never even advised the City's Planning Department of the existence of the Lease or that any of the parking was or would be conditional [T. 31, ln. 17–24; T. 51, ln. 18-22].

**The Rejection of the Lease will Provide Some Benefit to Unit Owners**

The Association has successfully proven that it exercised its business judgment appropriately in concluding rejection would provide some benefit to the unit owners. Whether or not the Lessor has a secured interest in any assets of the unit owners, so long as the unit owner pays, either to the Association or the Lessor, that owner's allocable portion of the Lease payment, the Lessor may not take any adverse action against the unit owner.[18]

Whatever the impact of rejection on any alleged parties to the Lease other than the Debtor and the Lessor,[19] I find that the Debtor is correct that, to the extent the Lessor can enforce the Lease directly against the unit owners, the Lessor may only seek from a unit owner (and by extension, any asset of the unit owner in which Lessor purports to hold a security interest) that unit owner's proportionate share of the Lease payment. The Lease provides:

> No lien against any fixtures or equipment in a condominium unit shall secure a sum greater than the percentage of the total existing monies due and owing the Lessor by the Lessee then in default equal to the percentage interest in the common elements and common surplus attributable to such condominium unit, and the lien against any equipment, furnishings, fixtures or portion of the said condominium unit may be discharged by the owner thereof by payment to the Lessor of such sum, and provided further that so long as a condominium unit owner shall pay that portion of the total monthly rental due and owing the Lessor equal to his proportionate share of the common expenses of the Association, either to the Association or directly to the Lessor, the Lessor will not and may not enforce any of its rights which it might otherwise have against the condominium unit owners under the terms and provisions hereof, notwithstanding that the Lessee is in default of this Lease and/or that any other condominium unit owner has failed to perform or keep its obligations as a member of the Lessee to pay his pro rata share of the common expenses of which the monthly rental under the

---

[18] Because this issue is one of contract interpretation and does not involve any issues of fact, I hold it is appropriate for me to make a conclusive ruling on this issue.

[19] The Debtor's position is that the rejection will cause termination of the Lease; the Lessor disagrees. While, as noted by the Eleventh Circuit in *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294 (11th Cir. 2007), rejection does not eliminate the existence of the entire executory contract, it does, with limited exceptions not applicable here, terminate a debtor's ongoing obligations under the contract. Thus, by way of example, the Association's obligations in the Lease such as indemnification, maintenance of insurance, reconstruction and repair, and the duty to assess unit owners, are terminated upon rejection. Whether, upon rejection, the Lease is terminated as between the unit owners and the Lessor (assuming there is any contractual relationship between the Lessor and the unit owners) is not an issue that I must decide now as it is not necessary to my ruling on the Rejection Motion.

terms and provisions hereof is a part. [20]

I find that this language unambiguously prohibits the Lessor from foreclosing on any property of an owner who has paid his or her proportionate share of the rent to either the Association or the Lessor.  The Lessor disputes this interpretation. To the extent that the Lease could be construed as ambiguous, it must be construed in favor of unit owners for two reasons. First, because the Lessor drafted the Lease and Dorten's president executed it on behalf of the Association, any ambiguity must be interpreted against the Lessor.  *Excelsior Ins. Co. v. Pomona Park Bar & Package Store,* 369 So.2d 938, 942 (Fla. 1979); *DSL Internet Corp v. TigerDirect, Inc.,* 907 So.2d 1203, 1205 (Fla. 3d DCA 2007).   Second, the Lessor's proposed contract construction – that the Lease prevents the Lessor from foreclosing on the hot water heater but not the unit of an owner who pays his or her proportionate share of the rent  –  is illogical.  *See James v. Gulf Life Ins. Co.,* 66 So.2d 62, 63 (Fla. 1953) ("The words of a contract will be given a reasonable construction, where that is possible, rather than an unreasonable one…");  *American Employers' Ins. Co. v. Taylor*, 476 So.2d 281 (Fla. 1st DCA 1985) (holding contracts should be interpreted so as to avoid an absurd result).[21]

The rate of delinquencies among unit owners has recently been as high as twenty-five percent (25%).  [T. 69, ln. 19; T. 94, ln. 12-25]. This has adversely affected the remaining unit owners.  It has required non-defaulting unit owners to pay far more than their fair share of the rent in order to keep the Association current on its rent obligation to the Lessor.  When seventy-

---

[20] This provision will also provide some protection to unit owners who have continued to pay the Association their share of the Lease expense even though the Association has not made any payments to the Lessor post-petition.

[21] The Lessor makes the absurd argument that this provision only precludes foreclosure of any lien on furniture, fixtures or equipment in the unit but does not prevent foreclosure rights against the unit itself.  First, one cannot foreclose, at least not easily, a security interest in a unit and not its fixtures.  Second, and more importantly, the Lease specifically provides that so long as the unit owner makes his or her proportionate payments "the Lessor will not and may not enforce any of its rights which it might otherwise have against the condominium unit owners under the terms and provisions hereof …".  Those rights, according to the Lessor, include its right to foreclose its alleged lien against the unit and the unit owner's proportionate share of the common elements.

five percent (75%) of unit owners are required to pay one hundred percent (100%) of the rent, they are effectively required to pay one hundred thirty-three percent (133%) of their proportionate share.  Moreover, Florida law prohibits a lien creditor from seeking to hold a condominium unit owner liable for more than his or her pro rata share of a common expense.  *See* Fla. Stat. § 718.121(3) ("If a lien against two or more condominium parcels becomes effective, each owner may relieve his or her condominium parcel of the lien by exercising any of the rights of a property owner under Chapter 713, or by payment of the proportionate amount attributable to his or her condominium parcel."); *see also* Fla. Stat. § 711.20(3) (1971) (repealed) ("In the event a lien against two or more condominium parcels becomes effective each owner thereof may relieve his condominium parcel of the lien by payment of the proportionate amount attributable to his condominium parcel.").  Thus, I find rejection will provide some benefit to unit owners.

**The Lessor does not have a lien on Association property.**

The Lessor argues that rejection would not provide any benefit to the unit owners because of the Lessor's alleged status as a fully secured creditor in all of the Association's property.  This argument fails because the Lessor does not have a perfected security interest in any Association property.  Indeed, the Lessor has now acknowledged in court and in various pleadings that it does not have a perfected security interest in any Association property.[22]

The Lessor's claimed security interest is based on language in the Lease where the Association purportedly grants to the Lessor "a continuing lien paramount and superior to all others, including condominium owners, upon its assets and common surplus."  The Lease also assigns to the Lessor "all the rents, issues and profits which might otherwise accrue to the Lessee

---

[22] The lack of an enforceable security interest in the Association's assets also undermines Lessor's related argument that the Rejection Motion should be denied because rejection of the Lease would give rise to a substantial <u>secured</u> rejection claim.

for the use, enjoyment and operation of the Demised Premises." The Association owns no real property and has very limited personal property. [T. 132, ln. 3–7].    Under the Uniform Commercial Code as adopted in Florida (the "UCC"), to create an enforceable security interest in personal property requires a detailed identification of asset classes.  Florida Statute § 679.402 (1971) (repealed) was in effect when the Lease was executed and required that valid security agreements contain "a statement indicating the types, or describing the items, of collateral." While these descriptions did not need be overly specific, generalized references to "all assets" are insufficient as a matter of law.  *See Davis v. Kisko (In re McKeon),* 7 B.R. 10 (Bankr. N.D. Fla. 1980).  Such generalized descriptions remain insufficient as a matter of law under the version of the UCC currently in effect.  *See* Fla. Stat. § 679.1081(3) ("A description of collateral as 'all the debtor's assets' or 'all of the debtor's personal property' or using words of similar import does not reasonably identify the collateral for purposes of the security agreement.").

The Lessor's argument that future rent obligations are collateralized by assets of the Association also fails because the Lessor's alleged security interest in personal property was never perfected prior to the commencement of this bankruptcy case.  Pursuant to 11 U.S.C. § 544(b), unperfected liens can be set aside in bankruptcy.  The UCC requires that a secured party file and maintain a UCC-1 financing statement with Florida Secured Transaction Registry.  Fla. Stat. §679.5011.  In this case, there is no evidence that any such financing statement was ever filed and maintained.[23]

The Lessor does not have a perfected security interest in cash of the Association for several reasons.  To perfect a security interest in cash, a secured creditor must be in possession or control of the cash.  *See* Fla. Stat. § 679.3121(2).  There is no evidence that, assuming a security

---

[23] Lessor also claims it has a landlord's lien for rent pursuant to Fla. Stat. §83.08.  To the extent that chapter 83 is applicable to the obligations of the Association under the Lease, such lien is expressly avoidable under 11 U.S.C. §545(4).

interest was created, that it was ever perfected.  There is certainly no evidence that any such security interest is perfected now. The only cash referred to by the Lease upon which the Lessor relies is common surplus and "rents, issues and profits."  "'Common surplus' means the amount of all receipts or revenues, including assessments, rents, or profits, collected by a condominium association which exceeds common expenses."  Fla. Stat. § 718.103(10) (renumbered from Fla. Stat. § 711.03(6) (1971)).   Florida law provides that common surplus is not an asset of the Association rather; it is an asset of the unit owners.  *See* Fla. Stat. § 718.115(3) (renumbered from Fla. Stat. §711.14(3) (1971)).   Moreover, there is no evidence in the record that the Association maintained a common surplus as of the commencement of this bankruptcy case; as a result, there was no common surplus to which any lien of the Lessor could have attached prior to the petition date.  Since the Association owns no real property, there are no rents, issues or profits from such real property; any cash that the Association holds is not generated by the Association's use of the "Demised Premises"; all the cash the Association holds is generated by assessments from unit owners.[24]

### The Lessor May or May Not Have a Lien on Unit Owner's Property

The Lessor argues that rejection would not provide any benefit to the unit owners because of the Lessor's alleged status as a creditor fully secured by individual units and the unit owner's allocable share of common elements.  The Lessor argues that unit owners will not benefit from rejection because, even if the Association is relieved of any obligation to pay rent, the Lessor can

---

[24] Lessor has suggested, in oral argument on another matter, that it has some inchoate claim to the cash which interest would have been perfected upon appointment of a receiver.  Lessor cites to *Carolina Portland Cement Co. v. Baumgartner*, 99 Fla. 987, 128 So. 241 (Fla. 1930) in support of its argument.  However, Lessor's reliance on *Carolina Portland* is misplaced.  *Carolina Portland*  stands for the proposition that even when a Lender has been granted a security interest in rents and profits of real property, that lien or interest is not perfected until such time as a receiver has been appointed.  (That requirement has been superseded by statute. Fla. Stat. §697.07. ) Of course, as already noted, since the Association has no real property from which rents or proceeds can be generated, there is no security interest in any cash that could be perfected by appointment of a receiver.  Consequently, Article XXIII(g) of the Lease, authorizing Lessor to seek appointment of a receiver, is meaningless.

now and in the future force unit owners to pay rent under threat of foreclosure on their individual units.  The Lessor's argument is premised on a number of necessary assumptions, including that (a) the Lessor is the holder of a valid and enforceable lien against each of the individual units for rent owed under the Lease; (b) rejection of the Lease by the Association would not relieve unit owners of any future rent obligations; and (c) even if unit owners remain liable for rent post-rejection, the unit owners would not benefit by the Association being relieved of its current obligation to collect funds from unit owners to pay the rent.

The Lessor argues that I must make a determination regarding its asserted lien on the units in the context of the Rejection Motion, but that any findings would not be binding on any future litigation between the Lessor and the unit owners on this issue.  Because I have found, lien or not, that the Lessor may not seek recourse to any collateral it may have while the unit owner has made its proportionate rental payment to either the Association or directly to the Lessor, it is not necessary for me to decide this issue for purposes of the Rejection Motion.[25]

**The Debtor has acted appropriately with respect to delinquencies.**

The Lessor argues that the Debtor had better alternatives than rejection of the Lease available to resolve its financial issues and consequently has been negligent in its obligation as an Association by failing to make special assessments in order to meet all the obligations of the Condominium and by failing to properly pursue remedies against nonpaying unit owners.  The Lessor also makes much of the fact that the Condominium is located on "Millionaire's Row,"

---

[25]*See In re Condominium Ass'n of Plaza Towers South, Inc.*, 43 B.R. at 22 ("[T]his Court does not decide any other issue including whether rejection terminates the lease, what recourse if any SMC has against the Unit Owners or whether the Unit Owners are guarantors, co-tenants or otherwise with respect to the Lease.  Those issues need not be decided in order for this Court to permit the rejection …").  Litigation regarding the extent and enforceability of the Lessor's liens against unit owners is more properly addressed in an adversary proceeding,  in which unit owners would have a more meaningful opportunity to intervene or otherwise participate.  The Association commenced such a proceeding, partly in its capacity as representative of unit owners pursuant to Fla. Stat. § 718.111(3), shortly after the conclusion of the evidentiary hearing on the Rejection Motion. *See* Adversary Proceeding No. 09-02107-LMI.  I currently have under advisement the issue of whether I have jurisdiction to consider the relief sought in the complaint.

somehow suggesting that the Condominium's geographic location injects its unit owners with the financial wherewithal of their neighbors.[26]

The Lessor's primary argument is that the Association has the absolute right, indeed, the obligation, to assess its unit owners in order to meet every obligation, whatever the consequence. According to Mr. Richter, the Lessor's expert on matters of condominium operation and management, a "condominium is really a mini-municipality" and, if the unit owners don't pay their assessments, just like if they don't pay their real estate taxes, their interests can be foreclosed. Mr. Richter's position is that a condominium association must assess its owners even if the owners can't afford to pay.[27] However, the unit owners are not a bottomless well, from which water may be drawn eternally with no consequences. As noted by the court in *In re Condominium Association of Plaza Towers South, Inc.*, the fact that a condominium association

> has the power or perhaps even the duty to assess its members for its necessary expense of operation belies the fact that the resources of its members are finite and that the Board of Directors must often choose between whether to hire additional security guards, or instead to paint the outside of the building, replace an aging air conditioning unit, or redecorate the lobby area. Under [the Lessor's] theory, the Board of Directors would never have a duty to question the cost of any particular acquisition since according to [the Lessor], the cost could simply be passed along to the Association members. SMC's argument fails to take into account that the resources of Plaza Towers, through assessments to its members are as finite as those of any other corporation.

43 B.R. at 21.[28]

Ms. Martin testified about the efforts of the Association to collect delinquent assessments. She testified that the Association hired an experienced management company and

---

[26] Mr. Richter testified that there are other condominiums in the area that charge higher assessments than the Association. [T. 342, ln. 14-16]. However, Ms. Martin testified that those other condominiums offer more amenities and many are still subsidized by the developers. [T. 106-108, ln. 5 – ln. 3].

[27] When pressed, Mr. Richter acknowledged that the Association has an obligation to try to reduce its expenses and perhaps provide "less services." [T. 416, ln. 6-8] Of course, that is exactly what the Board has done in this case. The Board has recognized the Condominium cannot afford to keep a pool; that is all that is left in the budget to cut. [T. 83, ln. 20-24].

[28] Although Judge Gassen's observations were related to the condominium association's qualifications to be a debtor, I believe his observations hold equally true with respect to this Debtor's decision to reject the Lease.

replaced its collections counsel.  [T. 63, ln. 6–15].  Ms. Martin testified that the management company sent out monthly statements to unit owners, referred delinquent accounts to collections counsel after 60 days, and implemented a policy to prohibit delinquent owners from renting their units to third parties.  [T. 63, ln. 16 – T. 64, ln. 10].  Ms. Martin further testified that the Association retained legal counsel to redraft the form leases used by unit owners to strengthen the remedies available to the Association if a unit owner defaults.  [T. 64, ln. 11–16].  While the Association has not recently commenced lien foreclosure actions, Ms. Martin explained that this is based on direct and specific advice of collections counsel that doing so would not be cost-effective in light of the lack of equity in the delinquent units.  [T. 82, ln. 9 – T. 83, ln. 1; T. 196, ln. 2-8].

Mr. Richter testified that, in his opinion, the Association could and should have taken certain more aggressive steps to try to collect unpaid assessments from delinquent unit owners such as pursuing foreclosure of units subject to senior mortgages in default and seeking to rent the units for the limited period of time prior to foreclosure by a senior lien holder.  Mr. Richter assumed any foreclosed unit could be rented immediately, thereby quickly offsetting the costs of foreclosure [T. 355, ln. 23 – T. 356, ln. 12] but provided no basis for such an assumption.[29]  Mr. Richter also testified that, had the Association pursued these aggressive tactics, it might have been able to avoid the adverse stigma and other difficulties associated with filing bankruptcy. However, in addition to being a paid expert for the Lessor, Mr. Richter does not manage the Condominium.  The Board relied on the advice of its lawyers and management company in making its decisions when to foreclose its liens on units, which reliance the Florida corporate statute invites.  Moreover, the issue of whether the Association could have tried to resolve its

---

[29] Indeed,  this testimony seems to be in direct conflict with nationwide and Florida reports that rental vacancies are way up.

financial difficulties through other means is irrelevant to the issue of whether I should defer to the Board's business judgment to reject the Lease. *See In re Old Carco, LLC,* 406 B.R. at 193; *In re Stable Mews Assocs.,* 41 B.R. at 600-01.

Even if I were authorized to substitute my business judgment for that of the Association under the circumstances, which I am not, I would not find the path advocated by Mr. Richter more appropriate than that chosen by the Association under the facts of this case. Mr. Richter's alternative would have required the Association to expend its limited resources against the advice of its collections counsel to pursue foreclosure proceedings on units lacking equity in the speculative hope of being able to generate more in rent than the associated legal expense prior to foreclosure by a senior lender. Thus, I find the Board acted appropriately and consistent with its obligations.

### The Association has Not Acted in Bad Faith

The Lessor also argues that the Association filed the Rejection Motion in bad faith and therefore the motion should be denied.

The Lessor argues that such bad faith is demonstrated by the Association's failure to describe in its Rejection Motion the pre-petition history of litigation between the parties. This argument is groundless. While it is true that there has been a history of litigation regarding the Lease, no pre-petition lawsuit has addressed the issue before me - whether the Association may reject the Lease pursuant to 11 U.S.C. § 365. Indeed, this issue could not have been previously addressed by a court of competent jurisdiction because it uniquely arises in the bankruptcy context and there is no evidence that the Association has been a debtor in a previous bankruptcy case.

The prior litigation between the Association or unit owners and the Lessor, which began

in 1977, has centered on the enforceability of the rent escalation clause, which such clauses, as I have previously noted, have now been declared to be unenforceable and against the public policy of the State of Florida.  Unfortunately for the unit owners, the issue of enforceability of the Lease's rent escalation clause was decided in favor of the Lessor and subsequent courts have held that decision is *res judicata* on that issue.

The cases previously litigated between the Lessor and the Association[30] or various unit owners are *Maison Grande Condominium Ass'n v. Dorten, Inc.*, 358 So.2d 851 (Fla. 3d DCA 1978) (without describing any issue, the Third District Court of Appeal affirmed a final judgment of the trial court.  Thus, the issue that was actually litigated cannot be determined from the opinion. However, a later case describes the trial issue on this appeal as involving the unconscionability of the escalation clause); *Levinson v. Maison Grande*, *Inc.,* 517 F. Supp. 963 (S.D. Fla. 1981) (plaintiff unit owners were unsuccessful in litigation, seeking to have the Lease held an unlawful tying arrangement under the Sherman Anti-Trust Act.); *Maison Grande Condominium Ass'n, Inc. v. Dorten, Inc.*, 580 So.2d 859, 861 (Fla. 3d DCA 1991) *aff'd in part, rev'd in part* 600 So.2d 463 (Fla. 1992) (While the court found that the escalation clause provides the Lessor with "extraordinary windfall profits and that the Florida legislature has declared such clauses against public policy," the court noted Florida Supreme Court precedent regarding the unconstitutionality of retroactive application of the statute. The Third DCA then certified the following question to the Florida Supreme Court -"Is an escalation clause in a condominium recreation lease that was entered into before 1975 enforceable after October 1, 1988, for the entire term of the ninety-nine year lease, where the lessor has not agreed to be bound by future changes in the condominium act?"); *Maison Grande Condominium Ass'n v. Dorten, Inc.*, 600 So.2d 463 (Fla. 1992) (the Florida Supreme Court answered the certified

---

[30] These are the reported appellate decisions only.  The trial court decisions were not reported.

question in the affirmative but overruled the award of fees and costs); *Maison Grande Condominium Ass'n v. Dorten, Inc.*, 621 So.2d 762 (Fla. 3d DCA 1993) (the court held that the Association's lawsuit to declare the escalation clause unenforceable based on a new Florida statute section was barred by *res judicata*.); *Gomez-Ortega v. Dorten, Inc.*, 670 So.2d 1107 (Fla. 3d DCA 1996) (a lawsuit by secondary purchasers of units was barred by *res judicata* because these unit owners were in privity with the Association when the prior cases were litigated.) Thus, while there has been a great deal of litigation between the parties, with the sole exception of the antitrust case, the litigation has all focused on one discrete element of the Lease – the enforceability of the rent escalation clause.[31]  Because the enforceability of the rent escalation clause is not being contested,[32] the nondisclosure of this litigation is irrelevant and certainly is not illustrative of any bad faith on the part of the Debtor.

The Lessor further argues that the Rejection Motion was filed in bad faith based on the factors considered in *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393 (11th Cir. 1988).   In *Phoenix Piccadilly, Ltd.*, the Eleventh Circuit explained:

> there is no particular test for determining whether a debtor has filed a petition in bad faith.  Instead,  the courts may consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions' or, in particular, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights.'

*Id.* at 1394 (internal citations omitted).

Based on the testimony, I find that the Association did not file its Chapter 11 petition for

---

[31] Thus, to the extent there are any other grounds to contest the validity or enforceability of the Lease (other than the Sherman Anti-Trust Act), or challenge the rights of the Lessor thereunder, nothing in these cases has any preclusive effect whatsoever.   For purposes of the Rejection Motion only, the parties stipulated that the Lease is valid.

[32] Indeed, it is the enforceability of the rent escalation clause that forms a basis for the Association's decision to seek rejection of the Lease. As Ms. Martin testified, at some point they will not be able to afford the Lease.  [T. 105, ln. 16-21].

the purpose of abusing the judicial process.  The Association presented credible testimony that it filed its petition to reorganize as a result of the shortfall in revenue caused by substantial unit owner delinquencies combined with the escalating cost of the Lease.  Since the petition date the Debtor has taken the steps it deems necessary to successfully reorganize – the rejection of the Lease.  If the Lease is rejected, the Association will be in a position going forward to satisfy its necessary expenses with the resources available to it.

Nor is it bad faith that the Association filed bankruptcy on the eve of a hearing to consider appointment of a receiver.  Many debtors file bankruptcy on the eve of pivotal hearings – usually foreclosure sales.  If all "eve of critical hearing" filings were dismissed as bad faith cases, there would be virtually no debtors.  While I cannot presume to predict how the state court would have ruled, I find that the timing of the bankruptcy is predictable, but not sanctionable.

I also find that the Association did not commence the bankruptcy case for the sole purpose of rejecting the disputed Lease, although there is no question that rejection is important, if not pivotal, to the Debtor's successful reorganization.  [T. 89, ln. 3–6; T. 144, ln. 5–7; T. 149, ln. 3-11].  Even if I were to conclude otherwise, I would not find the bankruptcy case to have been commenced in bad faith.  "[T]here is no such thing as 'bad faith' in bringing a bankruptcy case solely for the purposes of rejecting an overly burdensome executory contract." *In re Balboa Street Beach Club, Inc.,* 319 B.R. 736, 740 (Bankr. S.D. Fla. 2005) (denying contract party's motion to dismiss Chapter 11 case admittedly filed by owner of vacant real estate to reject purchase agreement that had been disputed in litigation); *see Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.),* 324 F.3d 197, 210-12 (3d Cir. 2003) (affirming denial of landlord's motion to dismiss Chapter 11 case because bad faith was not evidenced by debtor's filing of the case to reject lease and cap landlord's damages under Section 502(b)(6)); *Shell Oil Co. v.*

*Waldron (In re Waldron),* 785 F.2d 936, 939 (11th Cir. 1986) (recognizing that a troubled Chapter 11 debtor can seek reorganization to reject a contract where rejection is consistent with the "intended purpose of chapter 11 – to facilitate the adjustment of debts through reorganization"). The Lessor argues that *In re Matusalem*, 158 B.R. 514 (Bankr. S.D. Fla. 1993), warrants a contrary conclusion. I disagree. In *Matusalem* the court denied the Debtor's motion to reject a licensing agreement finding "the Debtor has failed to demonstrate good business judgment or even mediocre business judgment. There is no economic benefit to the estate and its unsecured creditors from a rejection [of the agreement at issue]." 158 B.R. at 522. The court then held that rejection should also be denied because it appeared the sole purpose of filing the bankruptcy case was to try to relitigate an issue that had already been litigated in several courts, to exact vengeance in a long standing family dispute, and that there was no business to reorganize. In this case the Association has demonstrated an intent to reorganize and has established the appropriateness of the bankruptcy filing.

The Lessor suggests that bad faith is reflected by the Association having not yet determined what steps it might take to restructure its affairs if I were to deny the Rejection Motion. The lack of a "Plan B" at this time is hardly indicative of bad faith. The Lessor has cited no authority suggesting otherwise. The Bankruptcy Code does not require bankruptcy courts to dismiss every Chapter 11 case where a debtor does not have a comprehensive roadmap for reorganization prior to the date of plan confirmation. If it did, reorganizations might never actually occur.

### THERE IS NO "DISPROPORTIONATE HARM" TO LESSOR

In *Robertson v. Pierce* (*In re Chi-Feng Huang*), 23 B.R. 798 (9th Cir. B.A.P. Cal. 1982), while discussing the standard that should guide the exercise of business judgment in the context of whether to reject an executory contract, the court explained that:

> [I]t is proper for the court to refuse to authorize rejection of a lease or executory contract where the party whose contract is to be rejected *would be damaged disproportionately to any benefit to be derived by the general creditors of the estate* as for example where most of the "benefit" of rejection of the contract would be captured by a third party at the expense of the unsecured creditors.

*Id.* at 801 (emphasis added). As the Second Circuit Court of Appeals noted in *In re Minges*, 602 F.2d 38 (2d Cir. 1979):

> We believe that such a *flexible test* for determining when an executory contract may be rejected, however termed (and "business judgment" is as good a label as any), *is most appropriate.* For in bankruptcy proceedings, the trustee, and ultimately the court, must exercise their discretion fairly in the interest of all who have had the misfortune of dealing with the debtor.

*Id.* at 43 (emphasis added) (ellipsis in original).

In applying the business judgment rule, other courts have also weighed the effect that rejection of an executory contract would have on the party whose contract is to be rejected. *See e.g.*, *Monarch Tool and Mfg. Co. v. Monarch Product Sales Corp.* (*In re Monarch Tool and Mfg. Co.*), 114 B.R. 134, 137 (Bankr. S.D. Ohio 1990) (denying debtor's motion to reject an exclusive distributorship agreement because rejection would disproportionately harm the non-debtor distributor, and rejection would not rehabilitate the debtor) ("Disproportionate damage to the other party to the contract provides a ground for disapproving rejection. … We find this factor to be present in the case before us. Distributor was set up for the express purpose of dealing exclusively with the products of Debtor. Quite simply, if rejection is permitted here, Distributor will be ruined.") (internal citations omitted); *see also Blackstone Potato Chip Co. v. Mr. Popper,*

Inc. (*In re Blackstone Potato Chip Co.*), 109 B.R. 557, 560-61 (Bankr. D. R.I. 1990) ("The court may refuse to authorize rejection where the party whose contract is to be rejected would be damaged disproportionately to any benefit to be derived by the general creditors of the estate."), *citing In re Meehan*, 46 B.R. 96, 101 (Bankr. E.D. N.Y. 1985); *In re Petur U.S.A. Instrument Co.*, 35 B.R. 561 (Bankr. W.D. Wash. 1983) (same).

However, as noted by the United States Supreme Court in *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513 (1984),

> The Bankruptcy Court is a court of equity, and in making this determination [whether to authorize rejection] it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization. The Bankruptcy Court's inquiry is of necessity speculative and it must have great latitude to consider any type of evidence relevant to this issue.

*Id.* at 527.

In this instance, the Lessor drafted a lease that retained for itself a portion of a patio that contained a pool and a small portion of the pool deck, and, logically, the parking located directly underneath this isolated, carved out portion of the pool area. The entire pool deck, including the swimming pool and the entire garage, including the parking spaces located under the pool, were clearly constructed specifically for the use of the residents when the Maison Grande was constructed in or about 1971. But for whatever reason, at some point in the process[33] the Lessor chose to carve out what appears to be an arbitrary section of these amenities to retain. As the Lessor notes, if the Lease were rejected, the Lessor could not conceivably lease the swimming pool to another condominium or for any other use.[34] As such, argues the Lessor, rejection of the

---

[33] After the construction plans were submitted to the City of Miami Beach.

[34] The Lessor argues that this would render its property effectively useless and the fair market value of the property destroyed. The Lessor argues that one court has already made this observation in *Levinson* where the U.S. District

Lease would create an extreme burden and undue hardship for the Lessor. Of course, it is difficult to be persuaded by the equities of such an argument when, even in the absence of the rejection, this very result is that which the Lessor has chosen for the end of the Lease - the Lease contains no purchase option whatsoever.  So, at the end of 99 years, assuming the Lease continues for its full term, the Lessor will be left with the portion of the pool deck that contains the pool and the parking spaces underneath, with no possibility of using the property for any other purpose whatsoever.  That is the result the Lessor chose.   Thus, any great injury that the Lessor would "suffer" by rejection is an injury of Lessor's own making, indeed of the Lessor's own design.  Obviously the Developer, who controlled the Lessor and the Association when the Lease was drafted, had a motive in carving out this odd, unique piece of real estate for the Lease. And obviously, as the architect of this relationship, the architect cannot be heard to cry that its own creation is inequitable, at least insofar as its own interests are concerned.  Moreover, if the Lessor is successful in demonstrating that the unit owners are parties to the Lease and that the Lease has continued viability of any sort, then the Lessor will continue to collect a proportionate share of the rent from each unit owner, in return, of course, for continuing to make the leased premises available for use.  Thus, arguably, at least until the financial resources of all the unit owners are exhausted by the monetary cost of the Lease, the Lessor could continue to enjoy what the Third District Court of Appeal recognized as "extraordinary windfall profits."  580 So.2d at 861.

I must balance the Lessor's weak, if not non-existent, equitable argument against the interests of the Association's other creditors and the impact of rejection on the Association's reorganization efforts.  As noted, *supra*, Ms. Martin testified that, in order to make payments to

---

Court found that the leased premises "is useless for any purpose other than serving the Maison Grande condominium."  517 F. Supp. at 969.  However, similar to the Lessor's certificate of occupancy argument (see n. 17 *supra*) this observation by the District Court doesn't even rise to the level of dicta, let alone a holding of the court.

the Lessor, the Association could not keep up with its other monetary obligations, many of which impact the safety and welfare of the unit owners. [T. 73, ln. 20-25; T 79; ln. 4-14]. Ms. Martin also testified that since the bankruptcy was filed the Association has been able to meet its other monetary obligations. [T. 143, ln. 10-14]. Thus, rejection will clearly benefit the Association's other creditors. Moreover, I have already held that rejection is pivotal to the Debtor's reorganization efforts. Thus, I find that equity in no way compels a different result than that which I have ordered; indeed, equity strongly supports rejection of the Lease.

Based on the evidence presented I find that the Association exercised sound business judgment in deciding to reject the Lease and that there is no evidence of abuse of discretion, bad faith, whim, caprice or any other circumstance which can or should cause denial of the relief sought by the Debtor. I also find that there is no equitable reason to interfere with the Debtor's proper exercise of its business judgment.

## CONCLUSION

The Lessor has made every effort to distinguish the case of *In re Condominium Ass'n of Plaza Towers South, Inc.*, but, in fact this case presents virtually the same issue – the propriety of a condominium association seeking to reject a 99-year recreation lease. In authorizing rejection Judge Gassen found

> The evidence before the Court demonstrates that the Board of Directors of PLAZA TOWERS has fully ventilated the issue, has held open meetings extending invitations to the various members of the Association to attend and express their feelings and if nothing else, it is crystal clear from the testimony produced at Trial that the members of the Association are in full and complete support of the decision made by the Board of Directors. SMC has not introduced any evidence tending to show that the business judgment of the Board of Directors of PLAZA TOWERS was improperly exercised and the Court will not second guess the business judgment of PLAZA TOWERS's Board of Directors unless there is a showing that their judgment is clearly erroneous. No such showing has been made.

43 B.R. at 21-22.  I so hold in this case as well.

**ACCORDINGLY, IT IS ORDERED** as follows:

A.      the *Debtor's Emergency Motion to Reject Unexpired Lease* (D.E. #8) is granted;

B.      the Lease described in such motion is rejected; and

C.      I shall hold a further hearing on what is the effective date of rejection.  The parties are to file any written submission on this issue no later than **March 9, 2010 at 4:00 p.m.,** and a hearing will be held on what should be the effective date of rejection on **March 16, 2010 at 1:30 p.m.**, Room 1409, 51 S.W. First Avenue, Miami, Florida.

**ANY PROOF OF CLAIM FOR DAMAGES ARISING FROM THE REJECTION MUST BE FILED WITH THE COURT WITHIN 30 CALENDAR DAYS AFTER THE ENTRY OF THIS ORDER.**

*#            #            #*

Copies to:
David N. Stern, Esq.
Lawrence Gordich, Esq.

Attorney Stern is directed to serve a copy of this Order to all interested parties and file a certificate of service with the Clerk of Court.